IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |
|---|---|
| **MARK A. GREEN,** *et al.*, | * |
| Plaintiffs, | * |
| v. | * Case No.: PWG-16-2572 |
| **JENKINS SERVICES, LLC,** | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Mark and Marcia Green (the "Greens") entered into a contract ("Contract") with Defendant Jenkins Services, LLC d/b/a Jenkins Restorations ("Jenkins") for Jenkins to demolish their house, which had been destroyed by fire, and rebuild it. Jenkins worked on the demolition and architectural planning but did not begin construction because the land was found unsuitable for an on-site sewage system, and as a result, Jenkins was unable to acquire the necessary construction permits. Stip. Facts ¶¶ 16, 37–38, ECF No. 88-1.[1] The Greens sued for damages on various grounds based on Jenkins's failure to perform, Compl., ECF No. 2, and the parties have filed cross-motions for summary judgment on the Greens' breach of contract and

---

[1] The parties' Joint Statement of Undisputed Facts ("Stipulated Facts") appears in Jenkins's Memorandum. Def.'s Mem. 1–7. The Greens adopted the Stipulated Facts and stated in their memorandum there are additional undisputed facts. Pls.' Opp'n & Mem. 6. Jenkins does not agree to those additional facts, Def.'s Reply & Opp'n 1, ECF No. 94, and therefore, those facts will not be considered as part of the Stipulated Facts.

money-had-and-received claims, the two claims that remain at this stage of the litigation.[2]  ECF Nos. 88, 89.

I find that no genuine dispute of material facts exists regarding Jenkins's liability for breach of contract.  But, the amount of damages to which the Greens are entitled cannot be determined on the record before me.  I also find that the Greens cannot recover under their money-had-and-received claim, as they have prevailed on their breach of contract claim, which entitles them to the same damages.  Lastly, I find the Greens' request for statutory interest to be premature.  Accordingly, I will grant the Greens' motion in part and deny it in part, grant Jenkins's motion in part and deny it in part, and this case shall proceed to a trial regarding the remaining damages.

## **Background**

The Greens owned a single family home on land they owned in Prince George's County, Maryland.  Stip. Facts ¶ 1.  On January 15, 2014, the Greens' home was destroyed by a fire.  *Id.* ¶ 9.  The Greens filed a claim with their insurer, USAA Casualty Insurance Company, who accepted the claim to cover the loss.  *Id.* ¶ 10.  The Greens, Jenkins, and a USAA adjuster signed an Authorization of Work on February 2, 2014 for the rebuilding of the Greens' home.  *Id.* ¶ 11 (citing Authorization of Work, Jt. R. 84).[3]  USAA directed Wells Fargo Bank, N.A. to hold the funds it was providing in escrow as the home was rebuilt.  *Id.* ¶¶ 14–15.

On May 12, 2014, the Greens entered into the Contract with Jenkins to demolish and rebuild their home.  The Contract included a "Description of Work" that stated the scope of the

---

[2] The parties fully briefed the motions. ECF Nos. 88-1, 89-1, 94, 95.  A hearing is not necessary. *See* Loc. R. 105.6.
[3] The parties submitted a Joint Record to chambers but have not filed a Notice of Lengthy Exhibit on the docket.

work Jenkins was to perform.[4] Stip. Facts ¶ 21 (citing Description of Work, Jt. R. 95–167). The Greens agreed to pay $581,222.90 in installments (either personally or from the insurance policy funds in escrow) to Jenkins. Stip. Facts ¶¶ 15–16, 18–24. Jenkins was paid a total of $133,311.88 from the Greens and Wells Fargo. *Id.* ¶ 29.

Jenkins agreed to obtain the necessary permits. Contract § 2, Jt. R. 86. As part of the permitting process, Prince George's County ("County") issued a demolition permit, and the Health Department conducted three percolation tests to determine whether a septic system could be installed. *Id.* ¶¶ 30–33. The property failed all three percolation tests. *Id.* ¶¶ 33–34. The test results caused the County to deem the property unsuitable for an on-site sewage system. *Id.* ¶¶ 36–37. Following the failed tests, the County wrote a letter informing the Greens that the property would require public sewerage facilities before it could issue a permit for the home to be rebuilt. *Id.* ¶ 37 (citing June 9, 2015 Cty. Ltr., Jt. R. 179). After that, "Jenkins ceased attempting to obtain permits for the construction," and the house was not rebuilt. *Id.* ¶ 38. By that time, however, Jenkins had incurred labor costs for the demolition (although it is not clear whether it completed demolition), as well as costs for a dumpster and a backhoe loader and operator; architectural and drafting fees; estimating and consulting fees; and costs for taxes, insurance, permits, and fees. Invoice, Jt. R. 194.

On February 9, 2016, the Greens demanded repayment of the $133,311.88 they had provided to Jenkins. Stip. Facts ¶ 38. On February 17, 2016, Jenkins acknowledged that it was overpaid by $12,526.36, which it then refunded during the pendency of this case. *Id.* ¶¶ 39, 43.

---

[4] Previously, Jenkins moved for judgment on the pleadings, ECF No. 31, which was denied, Mem. Op. & Order, ECF No. 77. At that time, the record included the same "Description of Work," Jt. R. 95–167; however, it was unclear if it was an assessment of the amount of insurance proceeds to which the Greens were entitled or if it was part of the Contract. Mem. Op. & Order 13. The parties now have stipulated that the "Description of Work" was incorporated into the Contract and described the work Jenkins would perform. Stip. Facts ¶ 21.

3

Jenkins also "prepared an itemized statement of the costs it charged against the $133,311.88 which the Plaintiffs dispute." *Id.* ¶ 41; *see* Invoice, Jt. R. 194–97.

On May 16, 2016, the Greens filed suit against Jenkins and others for, *inter alia*, breach of contract and money had and received. Compl., ECF No. 2; Am. Compl., ECF No. 29. Following the Greens' voluntary dismissal of their claims against the other defendants and all other claims against Jenkins, ECF Nos. 72, 73, 80, 81, 90,[5] the Greens and Jenkins filed cross-motions for summary judgment on the two remaining claims—breach of contract (Count XI) and money had and received (Count XII). Def.'s Mot.; Pls.' Mot.

### Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could

---

[5] I granted the Greens' voluntary dismissal of their claims against Jenkins for fraud, conversion, and conversion of a negotiable instrument following a telephone conference call that discussed the matter. ECF No. 92.

find for the party opposing summary judgment. *Id.* A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance).

## Discussion

### Breach of Contract

"Under Maryland law,[6] '[t]he formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir.2004)). "It is axiomatic that for a contract to be valid, both parties must mutually assent to be bound by it." *NeighborCare Pharmacy Servs., Inc. v. Sunrise Healthcare Ctr., Inc.*, No. JFM-05-1549, 2005 WL 3481346, at *2 (D. Md. Dec. 20, 2005). When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.,* 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012) (citations and quotation marks omitted); *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.,* 60 A.3d 1, 23 (Md. 2013). In these circumstances, the contract's construction is "an

---

[6] Both parties cite Maryland law. *See* Def.'s Mem. 9–10; Pl.'s Opp'n & Mem. 5; *see also Nationwide Mut. Ins. Co. v. Welker*, 792 F. Supp. 433, 437 (D. Md. 1992) (applying Maryland law for a contract dispute that arose in Maryland) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Accordingly, so shall I.

issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cty. v. Plymouth Rubber Co.,* 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990).

A breach of contract is "a failure without legal excuse to perform any promise which forms the whole or part of a contract . . . ." *In re Ashby Enters., Ltd.*, 250 B.R. 69, 72 (Bankr. D. Md. 2000) (quoting *Conn. Pizza, Inc. v. Bell Atl.-Wash., D.C., Inc.*, 193 B.R. 217, 225 (Bankr. D. Md. 1996) (quoting *Weiss v. Sheet Metal Fabricators, Inc.*, 110 A.2d 671, 675 (Md. 1955)) (quotation marks omitted)). Under Maryland law, "[t]he elements of a claim for breach of contract include 'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 17 A.3d 744, 749 (Md. Ct. Spec. App. 2011)). "When performance is due, . . . anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial." *See Nat. Prod. Sols., LLC v. Vitaquest Int'l, LLC,* No. CCB-13-436, 2014 WL 6383482, at *4 (D. Md. Nov. 13, 2014) (citing Restatement (Second) of Contracts § 235 cmt. b (1981)).

Contractual Obligations and Impossibility

Jenkins moves for summary judgment, arguing that although it had agreed to rebuild the Greens' home, its ability to do so became impossible through no fault of its own when the land failed the water table and percolation tests required to obtain a building permit and, consequently, the County did not issue a permit. Def.'s Mem. 7–8. The Greens move for summary judgment, arguing that Jenkins assumed the risk by unequivocally promising to gain all

required permits, or alternatively, that rebuilding their home is not impossible but merely more expensive. Pls.' Opp'n & Mem. 12–16.[7]

If a contract becomes impossible to perform due to "the inability to obtain a necessary governmental permit to carry out a contract" and by no fault of the alleged breaching party, that party is excused from performing its contractual obligations, provided that "such interference was not foreseeable at the time of the execution of the contract and the risk was not assumed by the promisor." *Acme Moving & Storage Corp. v. Bower*, 306 A.2d 545, 547–48 (Md. 1973). This is an exception to the "general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused," which the Maryland courts noted had "unjust consequences." *Id.* (quoting *State v. Dashiell*, 75 A.2d 348, 354 (Md. 1950)). The general rule "was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control." *Id.* (quoting *Dashiell*, 75 A.2d at 354). Now, under this exception, "a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty." *Id.* (quoting *Dashiell*, 75 A.2d at 354 (citing *Wischhusen v. Am. Medicinal Spirits Co.*, 163 A. 685 (Md. 1933); *Fast Bearing Co. v. Precision Dev. Co.*, 44 A.2d 735 (Md.1945); 2 Restatement (First) of Contracts § 458)). But, as noted, "if

---

[7] The Greens believe the house still can be built if they use an "engineered septic system," based on their expert's opinion that, although the County denied a permit for a traditional septic system, it previously has approved the use of an engineered septic system in certain circumstances. Dhalwala Expert Report, Jt. R. 231. For the Greens' property, their expert estimates that such a system would cost an additional $40,000.00. *Id.* at 232. Because Jenkins cannot rely on its impossibility defense, I need not address the Greens' argument that the house could be built with an engineered septic system.

7

the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of its [sic] was assumed by the promisor," then "an order which interferes with the performance of the contract is not an excuse." *Id.* (quoting *Dashiell*, 75 A.2d at 354).

Thus, "in those cases where a regulation of an administrative agency is already in force at the time of the formation of the contract, the decisive question is whether or not the promisor assumed the risk of interference by the regulation." *Dashiell*, 75 A.2d at 354. If the contracting party "ha[s] knowledge that it was necessary to obtain a permit, and they knew or ought to have known that there was a possibility that there might be [an issue] in obtaining the permit," then the party "recognized and assumed the risk of getting the permit." *Id.* Notably, a party is bound by what it promised to do in the contract and "[w]hat he promised to do is to be found in the words he used, and in what is reasonably implied by those words. Compliance with a governmental requirement of which he knew, or should have known or foreseen, is reasonably implied." *Damazo v. Neal*, 363 A.2d 252, 256 (Md. Ct. Spec. App. 1976).

The Contract between the parties states that "Jenkins Restorations shall comply with applicable building code and with all local requirements for building permits, inspections, and zoning. Jenkins Restorations shall obtain the necessary permits." Contract § 2, Jt. R. 86. This clause is unambiguous and establishes that Jenkins was responsible for obtaining a building permit. Maryland law provides that

> F. A person may not construct or alter any structure, residence, floating home, or commercial establishment served or to be served by an on-site sewage disposal system or private water supply system, and a county or municipality may not

> issue, if applicable, a building permit or a use permit for the desired new construction or alteration, until the Approving Authority[8] has:
>
>> (1) *Issued both an on-site sewage disposal permit* and a well construction permit for facilities served by an on-site sewage disposal system and a private water supply system; . . . *or*
>>
>> . . .
>>
>> (4) *Certified the existing on-site sewage disposal* and water supply systems as capable of treating and disposing the existing sewage flows and meeting the water demand and any reasonable foreseeable increase in sewage flows or water demand. The Approving Authority shall consider the number of bedrooms, total enclosed living space and changes that affect the volume or character of the wastewater in making this determination.

Md. Code Regs. 26.04.02.03 (2014) (emphasis added).

The Greens' property had an existing septic system and drain field, Stip. Facts ¶ 8, and Jenkins intended to use the system that existed, *see* Def.'s Mem. 16. The Contract does not provide for the creation of a septic system. *See* Description of Work, Jt. R. 95–167. Jenkins contends that its nonperformance should be excused because the property had what it believed to be "an existing, undamaged septic system" and "[t]here was no reason to foresee that the property would fail a percolation test and that it could not support an on-site septic system of any kind." *Id.* Even if it was reasonable for Jenkins to believe it could use the existing septic system—as its expert contends, Joyce Expert Report, Jt. R. 224—Jenkins nonetheless had to acquire a building permit, which as noted, the County could not issue unless "the Approving Authority" either "[i]ssued . . . an on-site sewage disposal permit" or "[c]ertified the existing on-site sewage disposal . . . system[]." *See* Md. Code Regs. 26.04.02.03(F)(1), (4). This regulation existed when the parties entered into the Contract.[9] Jenkins agreed in the Contract to procure the

---

[8] The Approving Authority is "the [Maryland] Secretary of the Department of the Environment or the Secretary's designee." Md. Code Regs. 26.04.02.01 (2014).
[9] The parties signed the Contract on the same day that the current form of this provision took effect. *See* Stip. Facts ¶ 16; Md. Code Regs. 26.04.02.03. However, this regulation was

necessary permits, and as an established restoration business, knew or should have known about the regulation's requirement that building could not begin until either the existing septic system was certified or an on-site sewage disposal permit was issued. Thus, Jenkins assumed the risk "of interference by the regulation," that is, the risk that the "Approving Authority" might not certify the existing sewage system. *See Dashiell*, 75 A.2d at 354; *see also Damazo*, 363 A.2d at 256; *Acme Moving & Storage Corp.*, 306 A.2d at 547–48. Further, Jenkins could have written a contingency within the Contract, excusing it from performance should the County not certify the system, but it did not. Therefore, Jenkins is not entitled to rely on the defense of impossibility when it should have known that certification of the existing septic system was required and that it was possible that the system would not be certified. Given that the house was not rebuilt, Stip. Facts ¶ 38, and Jenkins cannot rely on an impossibility defense, Jenkins is liable for breach of the Contract. *See Nat. Prod. Sols., LLC*, 2014 WL 6383482 at *4 (citing Restatement (Second) of Contracts § 235 cmt. b (1981)).

Breach by Exceeding Contract Charges

Even if Jenkins was excused from rebuilding the Greens' home due to impossibility, Jenkins nonetheless breached the Contract. Initially, Jenkins was paid $133,311.88 for the work and later refunded $12,526.36, citing an overpayment when the Greens demanded to be reimbursed and it "prepared an itemized statement of the costs it charged against the $133,311.88." *Id.* ¶¶ 29, 39–41. Jenkins argues that it was entitled to retain the $120,785.52

---

published on May 2, 2014 to provide public notice, and by law it went into effect ten days later. *See* Md. Code Regs. 26.04.02.03; Md. Code Ann., State Gov't § 10-117. Moreover, the current provision was substantively the same as its previous iteration. *Compare* Md. Code Regs. 26.04.02.03(F)(1), (4) (2014), *with* Md. Code Regs. 26.04.02.03(D)(1), (4) (2013).

remainder,[10] as it had completed work that was within the scope of the Contract—such as demolition, architectural drafting, consulting and the payment of fees—and the Contract did not prioritize the order in which the work was to be completed. Def.'s Mem. 10–11. The Greens argue that the work Jenkins completed did not benefit the Greens, because no construction began on the land, and therefore, Jenkins is not entitled to keep any of the deposit. Pls.' Opp'n & Mem. 19. The Greens concede, as they must, that the Contract included $23,744.43 for "General Demolition" and "Permits and Fees," but they argue that Jenkins should not be entitled to that amount either, because another contractor still could build the home at a higher price, and Jenkins should pay the difference in price for breaching the contract. *Id.* at 24.

The Contract between the parties explicitly itemizes the tasks and materials for which Jenkins would be paid. Within the Contract's Description of Work are categories for "General Demolition" ($11,744.43) and "Permits and Fees" ($12,000). Description of Work, Jt. R. 162. The Contract breaks down these categories further (e.g., "General Demolition" includes $6,775.68 for 192 hours of labor). *Id.* at 160. However, in keeping the deposit, Jenkins charged the Greens $24,952 for General Demolition and $61,211.70 for Permits and Fees, as well as $32,359.92 for heavy equipment, specialty items, tax, overhead, and profit. Invoice, Jt. R. 197.

> The Contract states that
>
> Any modification or change to the Contract Documents that changes the cost, the materials, or the estimated completion date, or that changes or supplements the Work to be performed, must be in writing and signed by the parties (Collectively "Change Orders"). Jenkins Restorations shall have no obligation to perform any change order work, extra work, or supplemental work not memorialized by a Change Order.

---

[10] The Greens indicate that Jenkins has retained $120,799.38. Pls.' Opp'n & Mem. 3. However, the record before me does not establish that Jenkins retained that amount. Given that the parties do not dispute that Jenkins was paid $133,311.88 and refunded $12,536.36, Stip. Facts ¶¶ 29, 43, it is undisputed that there is at minimum $120,785.52 in Jenkins's possession.

11

Contract § 3, Jt. R. 87. No Change Orders were signed by the parties. Stip. Facts ¶ 23.

By charging the Greens more than agreed to in the parties' Contract, Jenkins has breached the Contract. *In re Ashby Enters., Ltd.*, 250 B.R. at 72 (Bankr. D. Md. 2000) ("Maryland law defines a breach of contract as 'a failure without legal excuse to perform any promise which forms the whole or part of a contract. . . .'") (internal quotations omitted); *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 261 (4th Cir. 1981) ("Roadway's counterclaim for overcharges for parts is a contract claim since the method of charging was specified in a letter agreement, supplemental to the main agreement, and the claim is founded upon proof that the formula for charges was exceeded. Roadway is barred from recovery under Maryland law [due to its repudiation of the agreement] even if the amount of the overcharges could be proven."); *see also Harrigan v. Rolle*, No. ELH-14-199, 2014 WL 7146970, at *13 (D. Md. Dec. 14, 2014) (permitting a breach of contract claim under Pennsylvania law against attorneys who allegedly charged a client in excess of the agreed upon fixed fee). The clear, unambiguous contract language indicates that, for either party to modify the contract, both parties needed to sign a Change Order. Because the parties did not sign any Change Orders, Jenkins could only charge $11,744.43 for "General Demolition" and $12,000 for "Permits and Fees."[11] By charging $86,163.70 for "General Demolition" and "Permits and Fees"—services

---

[11] Jenkins also argues that an increase in these costs based on "Changed or Unknown Conditions" would be charged to the Greens, Def.'s Reply & Opp'n 15; however, that provision also requires changes to the contract price be in a Change Order. Contract § 14, Jt. R. 91 ("If in the performance of the Work, Jenkins Restorations finds latent, hidden or subsurface conditions that materially differ from the conditions Jenkins Restorations reasonably anticipated, or if such conditions are materially different from those normally encountered in the type of work provided for in this Contract, then *the Contract Price* and/or estimated date of Substantial Completion *shall be equitably adjusted by Change Order within a reasonable time after discovery of such conditions*.") (emphasis added).

that the parties agreed would cost no more than a total of $23,744.433—Jenkins has breached the Contract. *See In re Ashby Enters., Ltd.*, 250 B.R. at 72; *Harrigan*, 2014 WL 714690, at *13.

*Damages*

Having established that Jenkins breached the Contract, the Greens are entitled to damages. The Greens argue that they are entitled to a full refund because Jenkins did not provide them any benefit, and they also seek "the difference between Jenkins' contract price and the replacement estimate created."[12] Pls.' Opp'n & Mem. 24.

As a preliminary matter, Jenkins argues that the Greens agreed in the Contract to indemnify it, and therefore, it does not owe any damages. Def.'s Mem. 27–28. The Contract states:

> Customer shall indemnify and hold harmless Jenkins Restorations, its agents and employees, its subcontractors, or anyone employed by any of them from and against any and all damages, claims, suits, actions or losses that arise from: a) conditions, including without limitation mold, bacteria, structural damages, and/or construction defects, indoor air quality contamination, asbestos allergies, and environmental illnesses, that pre-existed the Work; . . . .

Contract § 10(b), Jt. R. 89. Jenkins essentially argues that the soil quality was a condition that pre-existed the work and the phrase "without limitation" does not exclude the soil quality from the list of circumstances giving rise to a duty to indemnify provided in the Contract. *See* Def.'s Mem. 27–28. This is too clever by half, because when construing an unambiguous contract, "courts . . . ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd.,* 56 A.3d at 670 (citations and quotation marks omitted).

---

[12] The Greens state that their expert estimates that an engineered septic system would cost an additional $40,000. Pls.' Opp'n & Mem. 12; Dhalwala Expert Report, Jt. R. 232. However, the Greens also include an estimate that the home now would cost $723,284.05 instead of $581,222.90. Pls.' Opp'n & Mem. 7; Regis Expert Report, Jt. R. 247.

13

Courts are not at liberty to ignore certain terms within a contract, and under the doctrine of *ejusdem generis,* when specific words are used, the meaning of a general term is restricted. *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 652 (D. Md. 2009) ("Courts often employ the rule of *ejusdem generis*, a principle of contract interpretation suggesting that when a general word follows a series of specific words, the specific words restrict the general."); *Waters v. Jos. A. Bank Clothiers, Inc.*, No. HAR-94-461, 1995 WL 328522, at *5 (D. Md. May 24, 1995) ("Under the doctrine of *ejusdem generis* when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned.") (internal quotation omitted). Here, for Jenkins to be indemnified for a "condition" (a general term) that pre-existed the work, the condition must be in the "same class or general nature" as "mold, bacteria, structural damages, and/or construction defects, indoor air quality contamination, asbestos allergies, and environmental illnesses." *See* Contract § 10(b), Jt. R. 89; *Waters*, 1995 WL 328522, at *5. Unlike soil quality, these terms all relate to hazards associated with the existing structure itself or illnesses associated with that structure. The ability of the soil on which the structure is located to support a septic system is not of the same class or general nature of the conditions enumerated in the Contract. Therefore, Jenkins is not entitled to indemnification, and is liable for damages. *See Dynacorp Ltd.,* 56 A.3d at 670; *Waters*, 1995 WL 328522, at *5.

In regard to damages, the record demonstrates that the Greens are not entitled to recover the difference between the Jenkins' Contact price and the replacement estimate. The County declared the property "unsuitable to support an onsite sewage disposal system," Stip. Facts ¶ 37 (citing June 9, 2015 Cty. Ltr., Jt. R. 179), and stated that "[t]his determination means the

14

property cannot be developed until public sewerage facilities are made available." June 9, 2015 Cty. Ltr., Jt. R. 179. Thus, the parties cannot proceed under the Contract as written, as it did not provide for the installation of a new septic system, *see* Description of Work, Jt. R. 95–167. Further, to rebuild the home with an engineered septic system would require a Change Order, and without a Change Order, Jenkins would not be responsible for completing any additional work or covering any costs incurred. Contract § 3, Jt. R. 87. Therefore, Jenkins is not liable for costs beyond those stated in the Contract.

Therefore, damages are limited to, at most, the payments the Greens already made to Jenkins. Because the parties did not agree to any Change Orders, the terms—more specifically the pricing—in the Contract are binding. At this time, ordering damages would be improper as some of the damages are disputed. However, others are established by the record. The Greens argue they deserve a full refund because they received no benefit from Jenkins. Pls.' Opp'n & Mem. 19. This is incorrect. The Contract itself called for Jenkins to conduct demolition, seek permits, and pay fees. Therefore, Jenkins was permitted to do that work within the scope of the Contract, and having completed some of that work, Jenkins is able to charge the Greens for it. Jenkins provided an invoice to the Greens for General Demolition, which stated it spent $24,952.00 on 400 hours of labor and renting a dumpster and $1,236.38 for permits and fees. *See* Invoice, Jt. R. 194, 197.[13] However, as discussed, Jenkins was not permitted to exceed those amounts without a Change Order. Thus, Jenkins is entitled to $11,744.43 for the expenses it incurred for demolition and $1,236.38 for permits and fees, as stated in the Contract.

---

[13] The Greens argue that Jenkins has not provided sufficient evidence to demonstrate it is entitled to retain these funds but only relies on summaries. Pls.' Opp'n & Mem. 21–22 ("Jenkins did not produce evidence of these payments, such as check fronts and backs, but instead relies on its own summaries."). However, Jenkins is not relying on summaries, but on an invoice it provided to the Greens. As this is a business record, it is admissible at trial and sufficient to demonstrate Jenkins expenses. Fed. R. Evid. 803(6)(B).

As the Greens have conceded, the Contract called for a total of $23,744.43 for General Demolition and Permit and Fees. Pls.' Opp'n & Mem. 21–22. Jenkins's invoice indicates that it charged the Greens $86,163.70 for these two categories and therefore, the Greens are entitled to a refund of, at minimum, $62,419.27 for the overcharges. As for the remaining $43,123.54— approximately half of which is profit, overhead, and taxes—material disputes of genuine fact exist regarding whether these items were within the scope of the Contract or if they should be returned due to Jenkins's breach of contract. For example, it is unclear to what category the "Backhoe loader and operator" ($2,251.44) is attributable and the parties dispute whether the consulting charges ($6,250) and architectural fees ($59,975.32)[14] are within the Contract and chargeable to the Greens. *See* Invoice, Jt. R. 194, 197; Pls.' Opp'n & Mem. 21–23; Def.'s Opp'n & Reply 13–14. Additionally, the amounts listed for profit, overhead, and taxes do not match the flat rate percentages (10, 15, and 6 percent respectively) that are listed in the Contract. *Compare* Description of Work, Jt. R. 162, *with* Invoice, Jt. R. 197.

Lastly, the Greens request statutory interest to be applied. Pls.' Opp'n & Mem. 4, 26. As there are genuine disputes of material fact that preclude a determination on all of the damages in this case, awarding statutory interest at this time would be premature.

*Count XII - Money Had and Received*

The Greens also moved for summary judgment on their money-had-and-received claim, arguing that if Jenkins' impossibility defense prevailed, they still would be entitled to the return of their deposit. Pls.' Opp'n & Mem. 5. Jenkins argues that it is entitled to summary judgment

---

[14] As Jenkins's invoice attributes the architectural fees to "Permit and Fees," Invoice, Jt. R. 194, 197, it may only recover a maximum in that category of $12,000, *see* Description of Work, Jt. R. 162. Therefore, if at trial it can demonstrate that charge is part of the Contract and attributable to the Permit and Fees category it only may recover $10,763.62 as it has already billed $1,236.38 in that same category.

on this claim because the Contract bars the Greens' recovery under this theory. Def.'s Mem. 16–17. The Maryland Court of Appeals has characterized money-had-and-received claims as unjust enrichment claims rooted in a quasi-contract theory. *See Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 843 A.2d 252, 288, 290 (Md. 2004). A quasi-contract is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where the circumstances are such that justice warrants a recovery as though there had been a promise." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 606 (Md. 2000) (quoting Black's Law Dictionary 324 (6th ed. 1990)). Certainly, Maryland courts have recognized exceptions to the general rule that a party cannot recover under a quasi-contractual theory when there is an express contract, noting that other jurisdictions have permitted recovery under these theories "when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual recission of the contract, when recission is warranted, or when the express contract does not fully address a subject matter." *Id.* at 608–09 (internal citations omitted); *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 772 n.9 (Md. 2004) (same). But where, as here, the party prevails on a breach of contract claim pursuant to which it is entitled to the same damages it could recover on its money-had-and-received claim, there is no need to resort to the alternative ground. *See Dashiell*, 747 A.2d at 609 ("There has been no evidence presented that would lead us to believe that an exception to the general rule is warranted. The subject matter of respondent's claim-recovery of money for work performed on the Detention Center-is covered specifically by several valid and enforceable provisions of the written contract between the parties."); *see also Capital Funding Grp., Inc., v. Credit Suisse Securities (USA) LLC*, No. 81, Sept. Term 2014, 2015 WL 9239133, *8–10 (Md. Ct. Spec. App. Dec. 16, 2015) ("once the jury found . . . an enforceable agreement and a breach

of that agreement, [the] quasi-contractual unjust enrichment remedy was precluded by the terms of the express contract between the parties. The circuit court aptly noted that [Plaintiff's] articulation of a breach of contract exception would 'consume[ ] the rule of *Dashiell*.'") (internal citations omitted). Therefore, summary judgment will be granted in Jenkins' favor as to Count XII. *See Dashiell*, 747 A.2d at 609–10; *Capital Funding Group, Inc.*, 2015 WL 9239133, at *8–10.

## **Conclusion**

In sum, the undisputed facts show that the Greens are entitled to summary judgment on their claim for breach of contract (Count XI). Additionally, Jenkins is entitled to summary judgment in its favor on the Greens' money-had-and-received claim (Count XII).

I find that genuine disputes of material fact preclude me from awarding damages based on the record before me, and therefore, damages will be determined at trial. However, there is no genuine dispute of material fact that the Greens were overcharged $62,419.27 for General Demolition and Permits and Fees and that Jenkins performed services within the terms of the Contract in the amount of $12,980.81. Lastly, I find awarding statutory interest to be premature at this time.

A separate order shall be entered in accordance with this Memorandum Opinion.


Dated: April 11, 2018　　　　　　　　　　　　　　　　/S/
　　　　　　　　　　　　　　　　　　　　　　　Paul W. Grimm
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

jml